IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| STACY SARLES o/b/o J.L., | ) |  |
|---|---|---|
| Plaintiff, | ) ) ) |  |
| vs. | ) | Case No. 11-3441-CV-S-ODS |
| MICHAEL J. ASTRUE,<br>Commissioner of Social Security, | ) ) ) ) |  |
| Defendant. | ) ) |  |

**ORDER AND OPINION AFFIRMING
COMMISSIONER'S FINAL DECISION DENYING BENEFITS**

Pending is Plaintiff's appeal of the Commissioner of Social Security's final decision denying the application supplemental security income benefits filed on behalf of her minor son, J.L.. The Commissioner's decision is affirmed.

I.  BACKGROUND

J.L. was born in September 1996. Plaintiff applied for benefits in early October 2009. Benefits are not payable prior to the month following the month in which the application was filed, so to be eligible J.L. had to be disabled in and after November 2009.

J.L. was diagnosed with ADHD when he was in kindergarten. He has been held back a grade level twice: at the time of the administrative hearing (in February 2011) he was in the eighth grade but should have been in the tenth grade. R. at 30-31. In February 2007, J.L. underwent an evaluation by a psychologist, Dr. David Shapiro; at the time, J.L. was ten years old and in the fourth grade. J.L.'s test results were "in the Low Average range of functioning for verbal, logical reasoning abilities [and] in the lower end of the Average range of functioning for nonverbal, visual-spatial reasoning abilities." R. at 276. These and other test results led Dr. Shapiro to conclude J.L.'s "overall

functioning to be in the Low Average range. He showed notable weaknesses in his vocabulary, factual knowledge base, and his concentration to solve orally presented arithmetic problems. All other assessed abilities were within normal limits." R. at 276. Academic functioning tests placed J.L. between grades 2.4 and 3.2, depending on the task at issue. R. at 277-78. In his conclusion, Dr. Shapiro opined that J.L.

> demonstrated the continuation of severe ADHD, oppositional defiant disorder, behaviors consistent with a conduct disorder, and the probable onset of bipolar disorder. The test scores revealed very significant attention and concentration deficits, particularly when [J.L.] is required to hold his attention over a sustained period. He also demonstrated sluggish cognitive processing, highly fidgety behavior, and notable difficulties with concentration for demanding information. . . . Although these concerns are very consistent with his longstanding diagnosis of ADHD, the findings from the Rorschach test also revealed disturbances in [J.L.'s] thought processes. He demonstrated instances of disorganized and illogical thinking and difficulties with his reality testing, or ability to accurately gauge the actions and intentions of others.

R. at 279. Dr. Shapiro recommended that J.L. "begin psychotherapy and appropriate medication treatments." R. at 279.

In July 2007 J.L. began seeing Dr. Dawn Dawson; the "concerns for treatment according to mother focused on anger, mood swings, relationship to brother, and school. Treatment addressed concerns with attitude and anger." His GAF score at the time was 55. R. at 216. Dr. Dawson prescribed medication (including Adderall) and provided therapy. R. at 222-29. In January 2008 J.L. went to the Colorado Boys Ranch ("CBR") for residential treatment. He was removed in March against the advice of doctors at CBR; at the time his GAF was 38. He then met with Dr. Dawson three more times; her opinions suggest Plaintiff's situation worsened while at CBR. R. at 217.

In September 2008, J.L. went to Ozarks Medical Center Behavioral Health ("OMC") and saw Dr. David Fontaine. No records were available to Dr. Fontaine at the initial meeting, and it does not appear that any diagnostic testing was conducted. Based on statements from Plaintiff and his own observations, Dr. Fontaine assessed J.L.'s GAF at 51-53 and referred him for a psychiatric evaluation. R. at 202-04. The following month, at which time Dr. Fontaine prescribed a combination of Abilify, Wellbutrin, and Strattera. R. at 206-07. In April, J.L.'s mother described him as "doing

2

fairly well. They are preparing to put him into an IEP at school. Behavior at home [h]as been fairly good although he is acting somewhat like a new teenager." (J.L. was twelve years old at the time). R. at 214. In September 2009, J.L. was in the seventh grade; his mother reported he had "been having more anger and explosive episodes recently." Dr. Fontaine increased J.L.'s dosage of Wellbutrin and discontinued the Abilify. R. at 215. In March 2010 Dr. Fontaine wrote that J.L. was "doing well" and "occasionally rebellious but as [sic] not showing any signs of bipolar disorder." J.L. exhibited a good affect and a stable mood, and Dr. Fontaine assessed his GAF score at 50. R. at 236. In October, J.L. went to OMC for a medication check, and his stepfather "report[ed] that occasionally [J.L.] gets upset when his cousins get away with things that he does not. Other that that he is doing well in school. He has two Ds, which they are working on right now. The rest of his grades are good." R. at 251. One month later, Dr. Fontaine assessed J.L.'s GAF at 40, but the accompanying notes do not clearly explain this dramatic change, saying only that J.L.'s "affect is bright. His mood is euthymic. He has had considerable mood shifting." R. at 250.

  Meanwhile, in February 2009, J.L. saw his primary care physician, Dr. Tammy Albrecht, for evaluation of his allergies. Allergy testing was arranged. R. at 196-201. From February through August, J.L.'s visits to Dr. Albrecht focused on his allergies and asthma, except for a visit in August when Dr. Albrecht increased J.L.'s dosage of Strattera because he had grown. R. at 188-195. Visits to Dr. Albrecht in October 2009 and March 2010 also focused on his allergies. R. at 245, 248. At the October visit, Dr. Albrecht noted that Dr. Fontaine was "managing [J.L.'s] psychiatric meds; seems to be doing much better." R. at 248. In April 2010, Dr. Albrecth completed an Individual Functional Assessment Form, upon which she checked six boxes, indicating J.L. had marked limitations in the areas of acquiring and using information, attending and completing tasks, interacting and relating with others, caring for himself, and health and physical well-being, and had less than marked limitations in the area of moving and manipulating objects. No explanations are provided. R. at 239.

  In December 2009, J.L.'s records – including school records – were reviewed by a psychologist (Geoffrey Sutton, Ph.D.) and a medical doctor (Dr. Eugene Tenorio) from the agency. The agency experts concluded Plaintiff's statements were largely (but not

entirely) inconsistent with J.L.'s scholastic and treatment records.  They opined that J.L. had no limitations in the area of health and physical well-being and less than marked limitations in the other five domains.  R. at 230-34.

The Record includes reports from various teachers.  Brenda Smith, J.L.'s Special Education Teacher and Case Manager, completed a questionnaire in October 2009.  It should be noted that the form used by Ms. Smith is the form prescribed for use by non-doctors because it asks objective questions and does not call for medical conclusions.  Ms. Smith saw J.L. for two classes (communication arts and math) daily from approximately the beginning of the school year.  She indicated J.L's current instructional level was sixth grade for math and fifth grade for reading and written language.  She noted J.L. had no problems in the functional areas of attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for himself.  With respect to the domain of acquiring and using information Ms. Smith indicated J.L. had "slight problems" (a rating of two on a scale of one to five, where one equals no problem at all and five equals "a very serious problem") reading and comprehending written material, comprehending and doing math problems, providing organized explanations, expressing ideas in written form, and learning new material.  In all other aspects of this particular domain she indicated J.L. had no problems, including in his ability to comprehend and follow instructions, participate in class discussion, recalling and applying previously learned material, and applying problem-solving skills.  In this area she wrote "[J.L.] follows directions well and pays attention in the small group setting.  He is able to work independently once the lesson has been taught to him."  Ms. Smith also wrote that J.L. "functions age appropriately.  He wants to act silly sometimes but is easily redirected back on task.  This does not happen often enough to warrant concern."  R. at 134-41.

Several other teachers completed assessment forms.  In contrast to Ms. Smith, these teachers utilized a form designed for use by those with medical training, and they checked boxes seeking medical opinions.

- J.L.'s math teacher, Amber Hunt, completed an assessment form in March 2010.  Ms. Hunt checked boxes opined that J.L. is markedly limited in his ability to

4

acquire and use information, less than markedly limited in his ability to attend and complete tasks, and not limited in any other area. R. at 257-58.

- In September 2010, J.L.'s science teacher (D. Keeling) indicated J.L. was markedly limited in his ability to acquire and use information, less than markedly limited in his ability to attend and complete tasks and move about and manipulate objects, and not limited in any other area. R. at 260-61.
- Amanda Newby, J.L.'s English Teacher, completed a form in December 2010, indicating J.L. was markedly limited in his ability to attend and complete tasks and interact and relate with others and less than markedly limited in all other areas. She wrote that J.L. "[s]eems to be mouthy lately. He is interacting w/ the students by acting out, which his classmates, for the most part, approve of." She also indicated J.L. was not turning in all of his homework. R. at 263-64.
- Jeremy Russell, J.L.'s math teacher, completed a form in December 2010, indicating J.L. was markedly limited in his ability to attend and complete tasks, less than markedly limited in his ability to acquire and use information, and not limited in any other area. R. at 265-66.
- Finally, D. Smith – J.L.'s social science teacher – submitted a report in December 2010 opining that J.L. was markedly limited in his ability to acquire and use information, less than markedly limited in his ability to attend and complete tasks, interact and relate with others, and care for himself, and not limited in the other two areas. R. at 269-70.

Plaintiff testified during the administrative hearing. She described an incident when J.L. was nine and fell off a stool in a restaurant and suffered a head injury. R. at 31-32. She described J.L. as crying a lot, throwing "fits like a 2-year old," and experiencing discipline problems at school. R. at 32-33. J.L. also fights with his brother and "absolutely hates" his younger cousins, sometimes strangling or hitting them. R. at 34-35. Plaintiff also testified that due to his ADHD, J.L. is "constantly on the go" and "has a hard time paying attention to anything," which affects his ability to concentrate and learn during school. R. at 35. She described J.L.'s grades and his academic abilities as being rather poor. R. at 36-37; but see R. at 160.

5

Before considering the six functional domains to be analyzed when considering a child's application for benefits, the ALJ evaluated the conflicting evidence presented to him. He gave little weight to Dr. Albrecht's April 2010 opinion because Dr. Albrecht's treatment notes did not address the issues reflected in her opinion: she treated him for allergies and asthma, not his psychiatric conditions. R. at 12, 14. The ALJ credited the report from Ms. Smith but not the reports from J.L.'s other teachers because Ms. Smith's report provided objective information that could be properly considered, while the other teachers purported to provide medical diagnoses. The ALJ did consider, however, the other teachers' narrative statements (to the extent there were any). R. at 14-15. Dr. Shapiro's opinions were used for background, but not as a basis for establishing J.L.'s capabilities because (1) those opinions were rendered before J.L. received regular treatment and (2) those opinions were rendered more than two years before the application was filed. R. at 11-12.

Based on the evidence he found to be credible as described above and the reported effects of J.L.'s medication (as described in Dr. Fontaine's reports, particularly his March 2010 report), the ALJ assessed J.L's capabilities in the six domains as follows:

- less than marked limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for himself
- no limitations in the domains of moving about and manipulating objects and health and physical well-being.

Because he did not find J.L. to have either (1) "marked" limitations in two or more domains or (2) "extreme" limitations in at least one domain, the ALJ found J.L. was not disabled.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the

Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Gragg v. Astrue, 615 F.3d 932, 938 (8th Cir. 2010).

### A.  Failure to Defer to Dr. Albrecht

For ease of discussion, the Court will first address Plaintiff's argument that the ALJ erred in failing to defer to Dr. Albrecht's opinion. Generally speaking, a treating physician's opinion is entitled to deference. This general rule is not ironclad; a treating physician's opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record. E.g., Anderson v. Astrue, 696 F.3d 790, 793-094 (8th Cir. 2012); Halverson v. Astrue, 600 F.3d 922, 929-30 (8th Cir. 2010; Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996). Moroever, in applying the treating physician rule it is appropriate to consider the underlying rationale for the rule's existence. "The treating physician rule is premised, at least in part, on the notion that the treating physician is usually more familiar with a claimant's medical condition than are other physicians." Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir. 1991) (citation omitted).

In this case, Dr. Albrecht was not J.L.'s treating physician with respect to his psychiatric condition. As noted, Dr. Albrecht made this point herself. Even if the Court were to characterize her isolated comments as "treatment" (which the Court is not doing), there is little doubt that Fontaine was far more familiar with J.L.'s condition than Dr. Albrecht and the ALJ could reasonably and justifiably decide that Dr. Fontaine was the more probative treating doctor. Finally, Dr. Albrecht provided no basis for her

7

conclusions. For these reasons, the ALJ did not err in declining to defer to Dr. Albrecht's April 2010 report.

### B. The ALJ's Assessment of the Six Domains

Plaintiff contends the ALJ erred in his assessment of the six domains. Specifically, she argues the ALJ should have found J.L. is markedly limited in three domains: acquiring and using information, attending and completing tasks, and interacting and relating with others. Regulations describe a "marked" limitation as follows:

> We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

20 C.F.R. § 416.926a(e)(2)(i).

In the Court's assessment, the evidence is equivocal at best. There is certainly evidence that might support a conclusion that J.L. was markedly limited in the three domains specified by Plaintiff. However, keeping in mind that Plaintiff must establish J.L. was markedly limited after November 5, 2009, there is also substantial evidence that supports the ALJ's conclusions.

Starting first with the domain of interacting and relating with others, the Record contains evidence suggesting the positive effects of J.L.'s medication. Teachers did not report any difficulties consistent with what is described in the regulation. In this regard, the Court agrees with the ALJ's assessment that a teacher's bare description that J.L. had a marked limitation is of no evidentiary value because that is a medical assessment. While J.L. reportedly had difficulty with his cousins and his brother, and had discipline issues at school, the anecdotal evidence does not so clearly demonstrate the existence of a marked limitation that the Court can conclude the ALJ erred.

8

Similarly, with regard to the domain of attending and completing tasks, the Record's anecdotal evidence does not compel a particular conclusion. More importantly, there is substantial evidence supporting the ALJ's conclusion that J.L. has limitations in this domain but those limitations are less than marked. While some teachers reported J.L. did not turn in homework, this sentiment was not expressed by all teachers. More importantly, failure to turn in homework does not automatically indicate a marked limitation in the ability to attend to and complete tasks.

The most troubling domain is the one for acquiring and using information. Plaintiff emphasizes the fact that J.L. has been held back twice and was still performing below his grade level. The Court notes the lack of diagnostic testing, which is curious given this is the one domain for which testing is available and for which standard deviations from the norm could be measured. On the other hand, J.L.'s grades were acceptable at times. In another case, the Court might consider remanding for reconsideration. Here, even if J.L. is markedly limited in this domain, the denial of benefits is appropriate because the decision that J.L. is not markedly in two or more domains is supported by substantial evidence in the Record as a whole.

### III. CONCLUSION

For these reasons, the Commissioner's final decision is affirmed.
IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
DATE: February 13, 2013    UNITED STATES DISTRICT COURT